# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00534-CV

**Alice Lucille Nelson, Appellant**

**v.**

**James Blackburn Nelson, Appellee**

**FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 395TH JUDICIAL DISTRICT
NO. 02-2162-F395, HONORABLE MICHAEL JERGINS, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

The trial court signed a final decree granting a divorce to appellee James Blackburn Nelson and appellant Alice Lucille Nelson and dividing the couple's property between them. On appeal, Ms. Nelson raises five issues complaining of the trial court's division of the couple's estate and of the court's denial of her claim of assault. Mr. Nelson has filed a brief asserting several cross-issues. We reverse the trial court's decree in part and remand the cause for a new property division.

### Factual and Procedural Background

The Nelsons married in late May 1989. About thirteen years later, Mr. Nelson filed his petition for divorce seeking a disproportionate share of the community estate and to have the community estate reimburse his separate estate for expenditures made to benefit the community. He also sought to have Ms. Nelson's separate estate reimburse the community estate for expenditures

that benefitted her separate property. Ms. Nelson filed a counter-petition asserting cruelty by Mr. Nelson and seeking a disproportionate share of the community estate due to the parties' future employability and her claim that Mr. Nelson was at fault for the breakdown of the marriage.

At the conclusion of a hearing on temporary orders, the trial court stated that the purpose of temporary orders is to preserve the status quo, not to make a just and right property division, and that "[t]he status quo is that those accounts just stay right there, except for reasonable and normal living expenses and attorney's fees." The court noted that the couple had owned a $100,000 E-Trade account and a $90,000 Bank of America ("BoA") account in the recent past, but by the time of the hearing, Ms. Nelson had withdrawn more than half of that money, leaving only $81,500 of the original $190,000. The court said, "I don't know where that $80,000 went, and I don't believe that she had reasonable and necessary living expenses . . . in the last year of $88,000." The court found that Ms. Nelson had dissipated about "seventy, fifty [sic] thousand dollars in community assets for her own benefit," told her to prepare an accounting of her expenditures in the last four months, and ordered her to pay $60,000 to Mr. Nelson to compensate him for her misuse of the community's funds. The court also required both parties to keep records of their expenditures in the future and not to sell, transfer, or move any assets or property by any method.

Several months later, the trial court signed a temporary order setting out and memorializing the terms announced from the bench. Each party was ordered to provide an accounting of all monies spent in the last nine months and to maintain a ledger of any future cash transactions of $200 or more, and Ms. Nelson was ordered to pay $60,000 to Mr. Nelson. The parties were enjoined from selling, destroying, or tampering with any property and from "[i]ncurring

2

any indebtedness, other than legal expenses in connection with this suit, except as specifically authorized by order of this Court." Each party was "authorized only" to "engage in acts reasonable and necessary to the conduct of [his or her] usual business and occupation," "make withdrawals . . . only for the purposes authorized by this Court's order," and "make expenditures and incur indebtedness for reasonable attorney's fees and expenses in connection with this suit" or "for reasonable and necessary living expenses."

There was testimony[1] that when the parties married in May 1989, Mr. Nelson had been employed by Lockheed Martin since late 1979, and Ms. Nelson had been employed by the I.R.S. since about 1975. Mr. Nelson retired in July 1990, and Ms. Nelson retired in September 1996. Mr. Nelson testified that he bought a house about three years before marrying Ms. Nelson and that he sold it during the marriage, making about $14,000 or $15,000 in profit. At the time of the marriage, Ms. Nelson also owned a house that she sold during the marriage for about $12,000 in profit. Mr. Nelson testified that they both used their separate proceeds from their respective home sales to buy a residence together. Mr. Nelson testified that in addition to using those profits, they also used $22,000 from his Lockheed IRA to make the down payment. Mr. Nelson asked that Ms. Nelson be reimbursed $12,000 and that he be reimbursed about $37,000 for their respective separate contributions to the first house they bought together. At the time of the divorce, the Nelsons owned two homes, one in Georgetown and one in Rockwall.

---

[1] The parties provided testimony and evidence during two hearings, the hearing on temporary orders held in January 2003 and the final hearing, held over several days in late January and early February of 2004. The same judge presided over both hearings, and the parties referred to evidence produced in both hearings in their arguments before the trial court and on appeal.

Mr. Nelson testified that he first realized the marriage was in trouble in May 2002. Ms. Nelson began spending more and more time in the Rockwall area with her daughter and grandchildren, becoming cold and aloof toward Mr. Nelson. Later in the summer of 2002, Mr. Nelson noticed that some financial documents such as bank statements "were beginning to disappear." He asked Ms. Nelson to return them, and she "first denied that she took anything, and then, subsequently, she said that that was her property and she wasn't going to bring it back."

Mr. Nelson testified that in August and September 2002, he and Ms. Nelson had about $109,000 in their E-Trade account[2] and about $81,000 in their BoA account. He had an IRA worth about $50,000, and Ms. Nelson had an IRA, started before the marriage, that was worth about $30,000 and to which $2,000 of community funds were added in 1997. Ms. Nelson also had an IRS annuity, half of which, approximately $150,000, remained at the time of the final hearing.

In November 2002, at Ms. Nelson's urging, the Nelsons decided to take a cruise with several other couples. Shortly before leaving on the cruise, Ms. Nelson went to see her daughter for about a week. Mr. Nelson testified that during that week, he noticed that the silver had been removed from the house, including their silver flatware for twelve and fifteen to twenty bowls and trays, and that when Ms. Nelson returned, she was "very cold, very aloof, kept to herself a lot and spent an inordinate amount of time on the telephone with her daughter." Ms. Nelson said that it was

---

[2] Mr. Nelson testified that there had been $117,000 worth of stock in the E-Trade account, but that after taxes were withheld, the total received from the stock sale was $109,000.

4

she who noticed things were missing over a period of several months leading up to the cruise, such as glassware and silver items, and that she thought Mr. Nelson's daughter had taken them.[3]

While the Nelsons were on the cruise, a neighbor called Mr. Nelson and told him that a moving van was in front of the Nelsons' house and that Ms. Nelson's daughter, Barbara Jenkins-Sanders, was at the house overseeing the moving company. On Mr. Nelson's request, the neighbor went to the Nelsons' house and told the moving company that Mr. Nelson had not consented to their activities. While he was talking to the neighbor, Ms. Nelson repeatedly "clicked off the phone," forcing Mr. Nelson to eventually go to the purser's office to use the ship's phone. When Mr. Nelson asked her about her daughter's activity, Ms. Nelson first denied knowing anything about it and later said, "Everything I'm doing is legal." The moving company left after being told that Mr. Nelson objected to their presence, so Jenkins-Sanders and two assistants rented a truck, loaded it with furniture and household items themselves, and moved those items to Rockwall.

After dinner that night, Mr. Nelson returned to the room he shared with Ms. Nelson at about 10:30 p.m. When he entered, he found Ms. Nelson on the phone with her daughter, asking about "the status of items being removed . . . specifically, what had been done and what was yet to be done." Mr. Nelson testified that he hung up the phone while Ms. Nelson was still talking, as she had done to him earlier, and that Ms. Nelson "became enraged" and attacked him physically. Mr. Nelson testified that she tried to kick him in the groin and then took off a shoe and tried to strike him with it. Mr. Nelson testified that the assault lasted for about ten minutes, during which his head was

---

[3] Mr. Nelson admitted that in late October 2002, he rented a storage space to which he moved several German antiques that were his separate property.

bloodied by her shoe, but that he did not fight back. He also said that she had attacked him on two other occasions during the marriage, but that he had never struck her. After Ms. Nelson "wore herself out trying to hit me and kick me," Mr. Nelson called the infirmary, which sent a wheelchair to pick him up. The ship's doctor wanted to put six stitches in Mr. Nelson's wound, but Mr. Nelson asked him instead to just use butterfly bandages to close the cut. Mr. Nelson then left the infirmary and went to the purser's office to arrange for a new room.

Mr. Nelson testified, "[A]s they were wheeling me down to the infirmary, Mrs. Nelson came running out of the compartment and ran down behind us and ran into the infirmary herself." When Mr. Nelson returned to the room to retrieve his luggage, he saw that Ms. Nelson had "turned over a chair, ice water pitcher, and she was standing there taking pictures of it with her camera." The next morning, Ms. Nelson told their friends that Mr. Nelson had abused her. One of their friends offered to take her picture, but Ms. Nelson refused, and Mr. Nelson testified that he did not see any contusions on her face.

Ms. Nelson contradicted Mr. Nelson's version of the fight. She said that Mr. Nelson was angry with her for moving things out of the house and that he hit her in the face, causing her to fall over a chair and bruise her shoulder and thigh. She said she hit him with her shoe to protect herself. She also said her bruises did not appear immediately after the assault. As evidence, Ms. Nelson introduced various medical records that recite that she told medical personnel that she was the victim of domestic violence, as well as photographs she and her daughter testified were taken when she arrived in Rockwall after the cruise, which show a cut on her lip and bruises on her arm and face. She denied staging the assault or the pictures she took of the room in disarray.

Virginia Hauser, one of the friends on the cruise with the Nelsons, testified that on the morning after the alleged assault, Ms. Nelson said "that she was all bruised and swollen." Hauser testified, "I looked at her, and I said, 'Alice, you don't have any bruises or swelling.' I said, 'You look fine,' because she said she did not have any makeup on." Connie Timko, another friend on the cruise with the Nelsons, also testified that she did not see any marks or swelling on Ms. Nelson's face on the morning after the alleged assault. Ms. Nelson left the ship that day and flew to be with her daughter in Rockwall.

Ms. Nelson, her daughter, and two men who helped Jenkins-Sanders move items from the Nelsons' house testified about the items that were removed during the cruise, saying they removed "one living group, one dining group and one bedroom group."[4] Jenkins-Sanders also testified that she met her mother at the airport after the cruise and that Ms. Nelson "had red marks on her" and a black eye. The men who helped Jenkins-Sanders move the furniture agreed that Ms. Nelson had a black eye and marks on her arm.

Mr. Nelson testified that although he filed his petition for divorce in November 2002, he was not able to serve Ms. Nelson for about six weeks and that by the time of the temporary-orders hearing in January 2003, it appeared that she had spent about $160,000 of the couple's $279,000 overall cash estate, leaving about $120,000. Mr. Nelson also testified that Ms. Nelson had used a credit account in his name to charge about $18,000 in twenty days' time, most of it to her divorce

---

[4] Mr. Nelson testified that more items were taken than those admitted to by Ms. Nelson and her witnesses. He testified that they took furniture and items from the "master bathroom, the master bedroom, the foyer, formal living room, formal dining room and half of the family room and parts of the office and a little bit of the second bedroom."

7

attorney. Mr. Nelson knew she had access to the card, which was several years old, but did not know she was still using it. Ms. Nelson admitted that she did not have Mr. Nelson's "express consent" to use the credit card to pay for her attorney's fees and other expenses.

### Evidence of the Alleged Assault

In her fifth issue, Ms. Nelson asserts that the trial court's finding that she "staged a physical confrontation in order to gain a strategic advantage" was against the great weight and preponderance of the evidence and an abuse of discretion.[5] However, matters of credibility are left solely to the trial court as finder of fact, and we may not second-guess those determinations. *See Schneider v. Schneider*, 5 S.W.3d 925, 931 (Tex. App.—Austin 1999, no pet.).

Ms. Nelson testified that Mr. Nelson was the assailant and produced medical records and photographs she and her daughter said were taken soon after the alleged assault. Mr. Nelson, however, testified that Ms. Nelson assaulted him and then hurried to the infirmary to report that he was the assailant. He further testified that when he returned to retrieve his luggage, he saw her taking pictures of the room, which he testified had been put into disarray after he left in a wheelchair. Finally, two people who were on the ship testified that Ms. Nelson did not have any visible bruises

---

[5] At the conclusion of the hearing on temporary orders, the trial court expressed doubt about Ms. Nelson's version of the fight, saying, "I've got some prosecutorial experience and a little bit of experience in looking at crime scene photographs, and I think you're missing something real big, and I'm not going to tell you what it is, because I'm sure that once I tell you what it is, she'll have a nice [pat] excuse for it, and I don't think there is a nice [pat] excuse for it." At the conclusion of the final hearing, the court said, "I'm still not convinced and do not believe that there was an assault. I believe that, at most, there may have been a mutual combat, and I'm not buying the assault. I still think those pictures were staged, despite the explanation that's finally been given here almost a year later, and I have my reasons in viewing those pictures to firmly and strongly believe that."

on the morning after the alleged assault, and the medical records show only that Ms. Nelson told medical personnel that she was the victim. Based on this record, we cannot conclude that the trial court abused its discretion in finding that Ms. Nelson staged the assault and that Mr. Nelson did not initiate the assault or cause Ms. Nelson's injuries. We overrule Ms. Nelson's fifth issue on appeal.

**Did The Trial Court Make Mathematical Errors?**

In her first issue, Ms. Nelson argues that the trial court made mathematical errors in its division of the community estate, which resulted in an unfair division of the property. Specifically, she complains about finding of fact 10, in which the trial court found that Ms. Nelson spent $43,567 more than Mr. Nelson in community assets and awarded that sum to Mr. Nelson, and finding of fact 13, in which the court awarded Mr. Nelson $19,000 because she used Mr. Nelson's credit card to charge attorney's fees and other expenses "in violation of the Temporary Orders in effect at the time"; both awards were made by reducing Ms. Nelson's interest in the equity the couple had in the Georgetown residence awarded to Mr. Nelson. Ms. Nelson argues that instead of assessing all of the two sums against her equity interest, the trial court should have halved the sums and subtracted those from her share, resulting in a total of $31,283 more awarded to Ms. Nelson. She contends that in making these "mathematical errors," the court abused its discretion because the court "found no basis for an unequal division of the community estate." We disagree.

Ms. Nelson complains that the trial court erred in finding that she violated the temporary order in charging her attorney's fees. We disagree. The temporary order allowed the parties to make expenditures or incur debt for reasonable attorney's fees and expenses associated with the divorce proceeding. Thus, Ms. Nelson certainly could have used community funds that

9

were in her control, her own credit, or even a joint credit account to pay her attorney's fees. However, the credit card she used was on an account in Mr. Nelson's name alone, and Ms. Nelson admitted that she did not have his permission to use his credit card while the acrimonious divorce proceeding was pending. Thus, in using a previously inactive card on an account bearing Mr. Nelson's name alone, Ms. Nelson essentially attempted to shift the entire burden of her attorney's fees to him. On this record, the trial court did not abuse its discretion in finding that Ms. Nelson violated the temporary order by secretly using a long-dormant card to charge her expenses to Mr. Nelson's credit account.

We now turn to the court's decision to assess 100% of the $43,567 and $19,000 sums against her share of the estate rather than splitting those two amounts between the Nelsons. Throughout the final hearing, the trial court expressed an intention to split the community estate evenly between the parties. The court said it was not looking at the total sums left in the community as of the date of the hearing, but instead, "I'm going to look at the marital estate at the time this all started happening and divide it up, and if somebody has already spent, by my count, $152,400 of their share, they've already spent $152,000 [sic] of their share." In a letter it sent to the parties after the hearing, the trial court stated that it intended to award the full $43,567 and $19,000 sums to Mr. Nelson and against Ms. Nelson. After subtracting the full $62,567 from Ms. Nelson's share of equity in the Georgetown residence and making other adjustments for varying awards of community property to the parties, the trial court stated that Ms. Nelson would end up with a net award of $8,000 worth of equity in the house. The court went on to explain that it was splitting other community assets evenly between the parties. In its final decree, the trial court ordered Mr. Nelson to pay $8,000

10

to Ms. Nelson. After the decree was signed, Ms. Nelson filed a motion for new trial, complaining that the $43,567 and $19,000 sums should have been split evenly between the parties, rather than assessed entirely against her.[6]

In its findings of fact and conclusions of law filed about six months after Ms. Nelson filed her motion for new trial, the trial court found that Ms. Nelson "inappropriately distributed" a total of $163,567 of community assets, removing three large sums of cash from three different accounts. To make up for that misconduct, Mr. Nelson was awarded $60,000 while the cause was pending, and the court stated that after subtracting that amount, Ms. Nelson still "spent $43,567 more community assets than" Mr. Nelson. "[T]o equalize that amount," Mr. Nelson was awarded $43,567 worth of Ms. Nelson's equity in the Georgetown residence. With regard to the $19,000 award, the court found that Mr. Nelson was entitled to that sum "to reimburse for charges placed on his credit card by [Ms. Nelson] for her attorney's fees in violation of the Temporary Orders in effect at the time." The court went on to make a finding related to "Division of the Marital Estate - Factors Considered in Just and Right Division," stating that in making its divisions, it considered that Ms. Nelson "staged a physical confrontation in order to gain a strategic advantage," "wasted and improperly utilized community funds," was "evasive and uncooperative" early in the proceedings, and "directly violated Temporary Orders of this court when she utilized [Mr. Nelson's] credit card for her attorney's fees." The court concluded, "No basis for disproportionate division of the marital

_____

[6] Ms. Nelson did not raise her "mathematical error" argument in the motion to clarify and/or reconsider that she filed before the trial court signed its final decree. In that motion she complained of other issues related to the trial court's division of property, but this particular argument was not raised until her motion for new trial.

11

estate for either party was found to exist, *excepting the provisions entered as a result of [Ms. Nelson's] inappropriate actions during this suit*." (Emphasis added.)

Ms. Nelson argues that the court had no factual basis for an uneven division of assets. However, the court found that she wasted and improperly used community funds, violated the temporary order by using Mr. Nelson's credit card to pay her attorney's fees, staged the fight on the cruise ship, and was evasive and uncooperative, and explicitly stated that it was dividing the estate evenly "excepting the provisions entered as a result of [Ms. Nelson's] inappropriate actions during this suit." We have already held that the trial court did not abuse its discretion in finding that Ms. Nelson staged the fight aboard the cruise ship. Ms. Nelson does not dispute that she withdrew large sums from the couple's community accounts and arranged for her daughter to take certain items from the Nelsons' home while they were on the cruise, nor does she dispute the trial court's determination that she spent more than $43,000 more than Mr. Nelson.

The two sums that were not split between the parties and instead were assessed entirely against Ms. Nelson were found by the court to be the result of Ms. Nelson's bad conduct. We cannot hold that the court abused its discretion in determining that because Ms. Nelson acted improperly with regard to those sums, she should bear the full brunt of her misconduct. We overrule Ms. Nelson's first issue.

**Mr. Nelson's Separate Property**

In her second issue, Ms. Nelson contends that the trial court's award of $37,150 as Mr. Nelson's separate property was improper because Mr. Nelson did not sufficiently trace his separate property. She further argues that even if he did show the separate nature of the funds, he

12

was not entitled to reimbursement and could claim only an equitable contribution, a claim he did not make in his pleadings.

All property owned by either spouse when a divorce is granted is presumed to be community property. Tex. Fam. Code Ann. § 3.003(a) (West 2006). A party claiming property as separate must show the property's separate nature by clear and convincing evidence. *Id.* § 3.003(b). If separate and community properties have been so commingled as to "defy segregation and identification, the burden is not discharged and the statutory presumption prevails." *Estate of Hanau v. Hanau*, 730 S.W.2d 663, 667 (Tex. 1987). "Mere testimony that the property was purchased with separate funds, without any tracing of the funds, is generally insufficient to rebut the presumption." *Robles v. Robles*, 965 S.W.2d 605, 614 (Tex. App.—Houston [1st Dist.] 1998, pet. denied); *McElwee v. McElwee*, 911 S.W.2d 182, 188 (Tex. App.—Houston [1st Dist.] 1995, writ denied); *see Osorno v. Osorno*, 76 S.W.3d 509, 512 (Tex. App.—Houston [14th Dist.] 2002, no pet.). However, a "showing that community and separate funds were deposited in the same account does not divest the separate funds of their identity and establish the entire amount as community when the separate funds may be traced and the trial court is able to determine accurately the interest of each party." *Welder v. Welder*, 794 S.W.2d 420, 425 (Tex. App.—Corpus Christi 1990, no writ). And, "when separate funds can be traced through a joint account to specific property purchased with those funds, without surmise or speculation about funds withdrawn from the account in the interim, then the property purchased is also separate." *Id.*

Mr. Nelson testified that he bought a house on Longwood Cove more than three years before the marriage. He sold it in February 1992, realizing between $14,000 and $15,000 in profit.

13

Ms. Nelson also sold a house that she owned before the marriage, realizing about $12,000 in profit. Mr. Nelson testified that he and Ms. Nelson used their separate funds to make a down payment on a house on Daybreak Cove, as well as $22,000 withdrawn from Mr. Nelson's IRA. The Nelsons later sold the Daybreak Cove house, buying and selling at least one more house,[7] and eventually bought the house in Georgetown in 2000, rolling the profits made from each home into the successive purchase of a new house. Mr. Nelson asked to be reimbursed $37,000 for his separate contributions to the Georgetown property and asserted that Ms. Nelson should be reimbursed $12,000 for her separate contribution. Ms. Nelson's attorney cross-examined Mr. Nelson on the issue of separate property, asking him whether he had produced a check or other documentation of the Daybreak Cove down payment or purchase price "that shows money from that IRA." Mr. Nelson responded, "I don't have a copy of a check, Ma'am, but I do have the withdrawal from the Lockheed IRA just before we closed on that house." He denied that the $22,000 withdrawn from his IRA was used for living expenses, saying, "We were short $22,000 on the down payment on that house, and if I hadn't withdrawn it from the IRA, we wouldn't have gotten that house." As proof of the separate nature of the funds, Mr. Nelson produced the settlement statements from the 1986 purchase and 1992 sale of his separate home on Longwood Cove. He also produced two account statements from his IRA account — one statement covered the period between January 1994 and March 1994 and showed an ending balance of $83,550.43 and the other was for the month of September 1994 and showed an ending balance of $33,306.15. Mr. Nelson testified that he had statements from the purchase and sale of the Daybreak Cove and Spicewood Mesa houses but did not introduce them into

---

[7] After selling the Daybreak Cove property and before buying the house in Georgetown, the Nelsons bought at least one other house, a house on Spicewood Mesa that they sold in 2000.

evidence.[8] Mr. Nelson did not provide documentation related to the couple's purchase of the Daybreak Cove house, nor did he provide evidence from which the court could trace any profits from that house through to the Spicewood Mesa purchase and then to the Georgetown house.

On appeal, Mr. Nelson argues that he met his burden of proof by his testimony and exhibits, asserting that Ms. Nelson removed most of the couple's financial documents in 2002. However, he did not testify that he was unable to produce particular documents due to Ms. Nelson's misbehavior or explain whether he attempted to obtain new copies of relevant documents. Mr. Nelson also asserts that Ms. Nelson did not present evidence that the down-payment funds were community funds or explain where the money came from. However, it was not Ms. Nelson's burden to establish that the down payment was made with community funds. Instead, we must presume that the Nelsons' assets are community, *see* Tex. Fam. Code Ann. § 3.003(a), and it was Mr. Nelson's burden to overcome that presumption with clear and convincing evidence tracing the separate nature of the funds. *See Osorno*, 76 S.W.3d at 512; *Robles*, 965 S.W.2d at 614; *Welder*, 794 S.W.2d at 425. Although we largely defer to the trial court's decisions related to a division of property, on this record, we must conclude that the trial court abused its discretion in finding that Mr. Nelson established through clear and convincing evidence the separate nature of the $37,150 he asserted should be traced from the sale of his Longwood Cove house through to the Georgetown house.

---

[8] Mr. Nelson also testified that in her 2003 deposition, Ms. Nelson admitted that her separate funds were invested in the Daybreak Cove house. However, Ms. Nelson's deposition was not introduced into evidence, nor was she asked about her earlier testimony.

Likewise, the evidence is insufficient to support the court's $12,000 credit to Ms. Nelson for her separate contribution.[9] We sustain Ms. Nelson's second issue.

**Property Valuation**

In her third issue, Ms. Nelson asserts that the trial court erroneously accepted Mr. Nelson's property valuation, which resulted in an unfair division of the property. She complains that the court abused its discretion in not accepting her property valuation, arguing that her valuations were the only values presented that were supported by evidence.

At the final hearing, both parties introduced proposed property divisions, listing the Nelsons' personal property and assigning values to the items. Asked whether the values he placed on the property were "based, entirely, upon your own personal knowledge and your own personal opinions of values," Mr. Nelson answered, "No, I used the blue book for the automobiles, and I used original receipts, as best I could find them, and my knowledge of original costs for these items." Ms. Nelson characterizes this statement as an admission that the values "were not the market values of the personal property," but from the context of the question and answer, it appears less that Mr. Nelson was admitting that his valuations were not accurate and more that he was attempting to explain that he reached his valuations by relying on something more than his personal opinion.

---

[9] Mr. Nelson incorrectly contends that the trial court credited Ms. Nelson twice for a $12,000 contribution. The court determined that the community estate included $170,000 equity in the Georgetown house, subtracted the parties' separate contributions from the total equity, and divided that sum in half, awarding each party $60,425 in community equity. The court then subtracted $43,567 from Ms. Nelson's half to equalize her overspending of the community's assets, reducing her share in the community equity to $16,858. Because Mr. Nelson was awarded the Georgetown house, the trial court then added $12,000 to Ms. Nelson's remaining community equity, bringing her share to $28,858. If the court had not added her separate contribution, she would have been penalized $12,000 rather than compensated for it. However, because we have held that the parties did not sufficiently show the separate nature of the down payment funds used to buy the Daybreak Cove house, the issue is moot.

16

Further, Ms. Nelson asserts that she was the only witness to testify "that those values she listed [in her valuation] represented the fair market values of the personal property," pointing to her testimony that "[t]he values came from — some of them came from Mr. Nelson's interrogatory, and some came from my personal view of what the items — what the fair market value would be worth." She said that she lowered many of Mr. Nelson's values because he often used the items' purchase prices. It is true that Ms. Nelson said she based her values on her "personal view" of the items' fair market value, while Mr. Nelson said he reached his values by looking to original receipts.[10] The trial court found that the property awarded to Mr. Nelson was worth $37,231 and that the property awarded to Ms. Nelson was worth $47,684, using as a basis Mr. Nelson's second property valuation, which averaged his higher values, largely based on original receipts, with Ms. Nelson's lower values.

"If a witness has personal knowledge of facts from which an opinion is derived, a rational connection exists between the opinion and the facts, and such is helpful, then it is within the court's discretion to allow the lay person to express an opinion on the value." *Laprade v. Laprade*, 784 S.W.2d 490, 492 (Tex. App.—Fort Worth 1990, writ denied); *see also Mata v. Mata*, 710 S.W.2d 756, 758 (Tex. App.—Corpus Christi 1986, no writ) ("an owner may testify to the value of his property, both real and personal, if he declares he knows its market value"); *Baker v. Baker*, 624 S.W.2d 796, 799 (Tex. App.—Houston [14th Dist.] 1981, no writ) ("When the owner of goods seeks to testify to their value, as distinguished from their value to him, the Texas rule is that he must show that he is qualified to do so; he is prima facie qualified to state it if he declares he knows the

_____

[10] Many of the items for which Mr. Nelson used original-receipt values were antiques from the 1880s or the 1950s. In reviewing the parties' valuations, we note that Ms. Nelson often valued the antiques remaining in Mr. Nelson's possession the same or higher than the price paid, according to Mr. Nelson's original-receipt values, while valuing the antiques in her possession lower than the original-receipt values.

17

market value." (quoting *Bavarian Autohaus, Inc. v. Holland*, 570 S.W.2d 110, 115 (Tex. Civ. App.—Houston [1st Dist.] 1978, no writ))). The trial court, as the fact-finder, is "entitled to consider the weight and credibility of the testimony and other evidence submitted in making its determination as to the valuations to be assigned to the various items of property." *In re Marriage of Jackson*, 506 S.W.2d 261, 266 (Tex. Civ. App.—Amarillo 1974, writ dism'd). When a trial court is asked to choose between different values, it has broad discretion in determining what values to assign. *See Williams v. Clark*, No. 03-03-00585-CV, 2004 Tex. App. LEXIS 4718, at *12-13 (Tex. App.—Austin May 27, 2004, no pet.) (mem. op.) ("faced with two conflicting versions of the value of a piece of the couple's property," trial court did not abuse discretion in choosing to believe one party over other).

Having reviewed the record and both parties' explanations of their assigned values, we cannot hold that the trial court erred in deciding to choose the compromise position midway between Mr. Nelson's higher values based largely on original receipts and Ms. Nelson's lower values based on her "personal view." *See id.* We overrule Ms. Nelson's third issue.

## IRS Pension and Savings Plan

In her fourth issue, Ms. Nelson argues that the trial court improperly mischaracterized a portion of an IRS Thrift Savings Plan and an IRS pension as community property instead of as her separate property. Ms. Nelson worked for the IRS for about fifteen years before she married Mr. Nelson and for slightly more than seven years after the marriage. The trial court awarded Mr. Nelson 16% of the IRS pension plan and awarded Ms. Nelson all of the IRS Thrift Savings Plan. In its pre-decree letter setting out its intended property division, the court said it was going to award Ms. Nelson "the IRS Savings Plan valued at $26,000," along with two other cash accounts worth

18

$19,300, and that it was going to award Mr. Nelson the Chamber of Commerce 401(k) worth $52,000. The court then said that those account distributions results in "an additional amount of $6,700 to Mr. Nelson," divided that in half, and added $3,350 to the balance owed by Mr. Nelson to Ms. Nelson. Two paragraphs later, the court said, "Retirement accounts are ordered distributed as set out in Ms. Nelson's parties Proposed Disposition of Issues, with each party getting 50% of the community share of the retirement accounts."

Ms. Nelson argues that the trial court erred in awarding Mr. Nelson any portion of the IRS Thrift Savings Plan or pension, pointing to an "application for immediate retirement" signed by Mr. Nelson in 1996 as proof that he relinquished his interest in both plans. However, that document does not appear to have been offered into evidence and, therefore, we will not consider it in our determination.[11] We overrule Ms. Nelson's issues related to the alleged relinquishment.

Ms. Nelson next contends that a large portion of the IRS Thrift Savings Plan should be considered her separate property and therefore should not have been included in the court's equalization of cash accounts. She asserts that her testimony and hearing exhibits were sufficient to trace the separate funds in the Thrift Savings Plan. However, at the hearing, Ms. Nelson testified that she worked for the IRS for about fifteen years before marrying Mr. Nelson, agreed when asked if she "believe[d]" that she contributed to the Thrift Savings Plan before the marriage, and testified

---

[11] Further, we note that the document, attached as an exhibit to Ms. Nelson's brief, was an application for Ms. Nelson to take immediate retirement from civil service with the IRS. The document states that an IRS employee must have her spouse's consent to choose an annuity payable only during her lifetime. Mr. Nelson signed the document, agreeing that he would have "[n]o regular or insurable interest survivor annuity." The document does not state that Mr. Nelson waived any and all interests in the IRS Thrift Savings Plan or pension.

that the community share of the Thrift Savings Plan was 7/22.[12]  However, she did not testify about any details such as when the account was established or whether contributions to the account were constant through the years or provide any documentation related to the Thrift Savings Plan, its date of origin, or contributions over the years.[13]

Similar to the record on the separate nature of the down-payment funds, the record related to the separate nature of the IRS Thrift Savings Plan is inadequate to show the separate nature of any funds in the plan.  Ms. Nelson produced no documentation related to the plan and testified only that she "believed" she contributed to the account before marrying Mr. Nelson.  Without evidence related to when the account was established and what sums were contributed, we cannot hold that the trial court abused its discretion in finding that the account was community property that should be included in its equalization of the parties' cash accounts.  *See Robles*, 965 S.W.2d at 614.

**Mr. Nelson's Cross-Points**

Finally, we address Mr. Nelson's asserted cross-points, in which he seeks a new division and larger portion of the community estate than that awarded by the trial court.  Mr. Nelson

---

[12] In her motion to clarify and reconsider, filed after the trial court's letter ruling but before the final decree was signed, she asserted that the IRS Savings Plan contained some separate property but that the trial court had not identified any separate funds.  However, in her motion for new trial, she set out the trial court's cash accounts division and said that the court "correctly equaliz[ed] the property by awarding Ms. Nelson $3,350 (one-half of $6,700)."

[13] The exhibit to which Ms. Nelson points as her proof of tracing, exhibit R-15, does not address the nature of the Thrift Savings Plan, nor do Ms. Nelson's other exhibits.  Exhibit R-16 is a detailed tracing of the origin of and contributions to another IRA, which was awarded to Ms. Nelson in an earlier divorce, and exhibit R-18, Ms. Nelson's proposed disposition of the parties' property, stated that the community portion of the Thrift Savings Plan was $8,616.62, stating without explanation that the remaining $18,314.57 was "owned prior to marriage."

did not file a notice of appeal and thus may not seek more favorable relief than that granted in the decree. *See* Tex. R. App. P. 25.1(c) ("A party who seeks to alter the trial court's judgment or other appealable order must file a notice of appeal."); *Lubbock County v. Trammel's Lubbock Bail Bonds*, 80 S.W.3d 580, 584 (Tex. 2002); *Welkener v. Welkener*, 71 S.W.3d 364, 368 (Tex. App.—Corpus Christi 2001, no pet.); *Quimby v. Texas Dep't of Transp.*, 10 S.W.3d 778, 781 (Tex. App.—Austin 2000, pet. denied). We dismiss Mr. Nelson's cross-points. *See Quimby*, 10 S.W.3d at 781.

## Conclusion

We have overruled Ms. Nelson's first, third, fourth, and fifth issues and dismissed Mr. Nelson's cross-points. We sustain Ms. Nelson's second issue, complaining of the trial court's finding that the parties are entitled to reimbursement for their separate estates' contribution to the purchase of the community home. We reverse the portion of the decree dividing the community estate and remand the cause to the trial court for a new division of the community property. *See Jacobs v. Jacobs*, 687 S.W.2d 731, 733 (Tex. 1985); *McKnight v. McKnight*, 543 S.W.2d 863, 867-68 (Tex. 1976); *McElwee*, 911 S.W.2d at 190. We affirm the remainder of the decree.

_____

David Puryear, Justice

Before Justices Puryear, Pemberton and Waldrop

Affirmed in part; Reversed and Remanded in part

Filed: July 23, 2008

21